Alright, Illinois Appellate Court 3rd Division is now in session. The Honorable Justice Sanders, thank you. Glad to be presiding. Pleased to see the counsel who are going to argue the police approach. Good morning, Your Honors. Michael Johnson on behalf of the appellant Enrique Rendon. And Assistant Attorney General Josh Schneider on behalf of the people of the state of Illinois. Okay, first of all, a bit of a brief announcement. Our colleague Justice Smith is not here today, owing to a significant personal matter that he had to take care of. He has, however, considered all of the briefs and will participate in our deliberations after listening to the tape that's going to be made. Which will segue into my next suggestion that that is for recording that amplification. And some of us have hearing issues, so you might want to boost it up a little bit. Finally, we're really not interested in talking about the amendment and the constitutionality and all that. What we want you to argue about today is whether or not there is sufficient probable cause that he ought to have an evidentiary hearing. You briefed that issue quite well on both sides, so we want to hear an argument on that alone. Okay? Yes, thank you. Thank you. Please proceed when you're ready. May it please the Court. Counsel. Mr. Rendon has been committed or detained under the Sexually Violent Versus Commitment Act for over 18 years. In August of 2015, he requested a discharge hearing. His request for a hearing was denied in a perfunctory manner in which he had no right to present evidence, no right to cross-examine evidence, no right to confront the witness against him, and no right to even be present, although he was present. Now, would that ordinarily happen in the preliminary stage of these proceedings? That happens quite frequently where each year, at least, some type of proceeding has to occur after someone is committed. So it does happen frequently. The only way to get to a hearing is to either file a petition for discharge, which gives you a probable cause hearing. But the legislature has provided that you don't have to file a petition for discharge in order to get to this discharge hearing, and you can simply point to the reexamination report and say, look, there are facts here that show that there's probable cause that I'm no longer or that this person is no longer a sexually violent person. And that's what we've done in this case. And all Mr. Rendon is asking for is that discharge hearing. Turning to the facts which establish probable cause, the probable cause standard is a low standard that was first adopted by the Supreme Court in the Harding case and then applied to these post-commitment proceedings in the Standbridge case. And that is simply whether there's a plausible account of the required elements. And in this case, that would be whether Mr. Rendon is no longer a sexually violent person, meaning he no longer has a mental disorder, or he no longer has a mental disorder that causes a substantial probability to engage in acts of sexual violence. The major thing we're talking about here, of course, is the risk of recidivism by this person who has been judged by his own admission initially to be an SVP. And so the question is, how can you present this argument when you've got Dr. Smith saying that he still is and then you ask for another expert to be appointed? And although it's not part of our record here, it was alluded to in the trial court below that the expert indicated that he also, Dr. Wood, I believe, also believed that Mr. Rendon was still an SVP and should remain in conditional release. So a couple of answers there. Number one, the statute does not require an expert opinion. The statute, Section 65, requires the court to consider whether facts exist. But the court, if this gets remanded back for an evidentiary hearing, the court's going to hear from both these experts, right? Well, with respect to Dr. Wood, he was appointed to do an evaluation of whether Mr. Rendon should be conditionally released. So he was appointed pursuant to the petition for conditional release that was filed by Mr. Rendon, not to evaluate him necessarily for discharge. Did he reach a judgment, however, on whether or not, in his opinion, he was still an SVP and was still appropriately kept in conditional release? Well, he certainly reached the conclusion that Mr. Rendon was appropriately placed in conditional release, which requires that he was a sexually violent person. But he was not asked to consider whether. Will they get to ask him at the evidentiary hearing what his opinion is on that? Well, I suspect that we would ask for, I mean, yes. Whoever we call as a witness, whether it be Dr. Wood or someone else, as a discharge witness, this thing would, of course, get to ask at a discharge hearing. Just give me your idea of what this evidentiary hearing would likely consist of. Because we know that Dr. Smith's report is very detailed, 30-some pages, included references to all of his previous reports. So other than that and other than perhaps his testimony at cross-examination, what is it that you envision the evidentiary hearing would consist of? Well, Dr. Smith, in concluding that Mr. Rendon is still a sexually violent person, has made a lot of judgment calls and chosen between a lot of conflicting facts and influences in determining and concluding that he's still a sexually violent person. So there's plenty of fodder for cross-examination, right? Yes. I don't think there's any doubt about that. But other than the examination and cross-examination of Smith, what is it that you envision the trial court would be dealing with should we remand this back for the requested evidentiary hearing? Well, we would ask the trial court to appoint an expert, whether that be Dr. Wood or someone else. And if the court allowed that request, we would have an expert psychologist do an evaluation of Mr. Rendon to determine whether he's still a sexually violent person. If that evaluation came back as something that we disclosed, then we would put that witness on during the respondent's case-in-chief. The discharge hearing could be in front of a judge or a jury under the act. So the state would get a chance to— And he's never had that at all since he consented early on, right? He's had several witnesses appointed to evaluate conditionally, but he's never had one for discharge. Right. Okay. Does he have a burden at the preliminary stage of these proceedings? Did Mr. Rendon have a burden at all to produce anything at all? The state suggests that he did. I would say he did not. He did not file a petition for discharge. If he would have filed a petition for discharge, then he would have had this burden, but a burden of proven probable cause. But in a proceeding where the case, the court's consideration is limited to argument of the parties and the report of the state's expert, and Mr. Rendon is not allowed to present evidence, not allowed to have—no, I should say he doesn't have a right to have an expert at that stage. He doesn't have a right to cross-examine. He could not have a burden. There is no burden placed on him in the statute either. How does that square? I understand your argument, but how does that square with the Wilcoxon case, upon which you rely? The Wilcoxon case, I believe the respondent had petitioned for either conditional release or discharge, and he did have an evaluator appointed. So it was a different procedural policy. It was a preliminary stage. Well, it was a different preliminary stage, because there really is — there's four different preliminary stages. One is through the conditional release petition. Another is through a petition for discharge that the respondent files. Another is through the petition for discharge that the Department of Human Services files. And finally is the situation that Mr. Rendon is in. So then the posture of the case determines the petitioner's burden. It does. If any. If any. If any. And it determines the scope of the hearing. So if he were to file a petition for discharge, then he could have asked for an evaluator and put on evidence and have a live probable cause hearing, which seems to have happened in the Stanbridge case. But for this case, he did not. And so he was stuck with relying on the evidence and the facts that were within Dr. Smith's reexamination report. And we know that Dr. Smith has scored Mr. Rendon on the Static-99-R with a score of 1. And that score of 1 is associated with a recidivism rate between 9 and 15 percent. Let me try to understand, because it's a little obtuse reading his report. On that issue, on the Static-99, 1 is supposed to be the lowest rate of recidivism, yet IDOC has a system by which people like Mr. Rendon, who are declared to be an SCP, automatically go into a separate category altogether. Can you explain that to me? And is there literature to support that sort of redesignation? Is the court referring to Dr. Smith placing him in this high-risk, high-needs group? Yes, and I think the same thing happened in the Wilcoxon case. Sure. After an evaluator scores someone on the Static-99-R, they look at, they compare that score to groups of individuals, and there are two groups. There's a routine group, which consists of all the offenders that they looked at in the study, and then there's this preselected high-risk, high-needs group, which is supposed to be individuals who are a little bit higher risk. That determination made by Dr. Smith is, again, choosing between conflicting facts and inferences to place him in the high-risk group as opposed to the routine group, and the absolute recidivism rates associated with the routine group are even lower. So... I mean, in the former group, somebody who's 68, 69, whatever Mr. Rendon is, there'd be vanishingly small risk of recidivism. In both groups, it's pretty small. Certainly, both groups are made up of sex offenders who have a wide range of ages, from very young, 18, through very old. So in that way, both of the groups are a little bit skewed because they're comparing him to people with a score of 1, which also includes individuals who are 18 or higher risk to re-offend. So it's sort of an imperfect comparison, but I think ultimately, another factor to keep in mind with the Static-99-R is that after someone turns 60, they stop losing points on that. So he can't go down another point when he turns 70 or when he turns 80. That has to be something that's considered independently, and Dr. Smith did not do that. He said the risk for re-offending is accounted for by the Static-99-R, even though he's got 9 more years since he had a score of 1, and he's never accounted for that decrease in risk. Second, Mr. Rendon has had over 18 years of treatment. He has, over the course of these 18 years, identified cognitive distortions that he's previously had and worked to correct them. He's identified thinking errors, and he's worked to correct those. He's taken anger management and substance abuse programs to deal with those risk factors. He's worked to understand his offending cycle. He's worked to earn conditional release, which was revoked, but was ultimately reinstated by this court. And throughout that time, even while he was sitting back in the TDF on a revocation, he continued in the treatment, and he actually processed and disclosed and talked about all the things that were going on with him that might have been problematic while he was on conditional release. So, counsel, is it just your position that the trial court erred in its evaluation of the only evidence that was put before the court? Because you indicate that at this stage in the proceedings, Mr. Rendon had no burden to produce anything. So all we have is Dr. Smith's report and some other evidence, I think Dr. Wood's report as well, which I haven't had an opportunity to review. So all that was before the trial court were these cold reports. Is it your position that in light of the reports, that that alone should have been sufficient in light of what Dr. Smith even offers in his or her report would have been sufficient to warrant an evidentiary hearing? Yes. And that's based on the consideration of Dr. Smith's report because, again, he could not introduce any other evidence. Now, you've been up here before, and you had an opinion on this, and his conditional release was revoked, and then we remanded it back. It stayed objective, but the court ultimately did put him in conditional release. But did the nature of the conditional release change in some meaningful way? Because I read something in the record that indicates that the current form of conditional release he's in is something called maximum supervision. Is that the same that he had before? Yes. Essentially, it's just restricted movement, and he's on house arrest, which he was on house arrest in 2010 and 2011 and 2012. Okay. So I think the quote I saw was that he could take out his garbage, collect his mail, and do laundry in his building. Right. Is there some limited phone use availability? There is approved phone use. If you approve him to call his sister, then he can call his sister. But otherwise, he can't just pick up the phone and call anybody he wants. That's part of what the conditions of release are, at least right now. Another component of treatment that he completed in the TVF while he was, you know, between conditional release periods was this arousal management and reconditioning group, where he learned to manage and interrupt his deviant sexual fantasies that he had previously had on conditional release. And the evidence shows, at least as of the review by the trial court in this case, that that's exactly what he was doing. He was interrupting the fantasies when he was having them, and he was not allowing them to continue in a problematic way. And that's a major change that he's made that could certainly lead a fact finder to conclude that he is no longer a sexually bound person. Additionally, he's also, while he was in the TVF, took this penile-pathysmograph examination in 2013, and that showed that there was no significant arousal to any of the deviant segments that were presented to him to show he was aroused by those things. So compared to the respondent in the Wilcoxon case, who there was probable cause for, Mr. Rendon has had much more treatment. He's got a better attitude. He's got less misconduct. That respondent in Wilcoxon engaged in- Wilcoxon had an expert saying he was no longer an SVP. Yes. That's materially different. And the state has said that, quoted Stanbridge saying, well, you know, we have to present a plausible expert opinion. That was not the holding of Stanbridge, and it's not required under the language of the Act. So Stanbridge was quoting from the Wisconsin case where that case, where that court was choosing between conflicting expert opinions, but the Stanbridge case did not hold that that's something that we had to present. All that we have to present is facts sufficient to show that there's probable cause that he's no longer a sexually violent person. Now, I want to be clear. You said that at this stage in these proceedings, given the posture, that Mr. Rendon would have been precluded from presenting anything. Yes. What would occur just mechanically if at this stage in another case the report of the state's evaluator was something to the effect that this individual remains sexually violent? What recourse would such an individual have if they're precluded from presenting anything? They have no burden, and all we have now is the state's report, the state's evaluator's report, which says this individual remains SVP. I think in that case you'd be coming up to showing that there's a constitutional problem with that annual reexamination process. We're going to go to your new process argument. Yes. Okay. If there are no further questions, the legislature has provided for this process where he can get a discharge hearing without petitioning, without an expert opinion, and that's what we're asking this court to do is to remand for such a discharge hearing. Thank you. Thank you. Thank you. May it please the court. Again, Assistant Attorney General Josh Schneider on behalf of the people of the state of Illinois. I want to start with the question of the quantum of evidence required to show probable cause to believe that someone is no longer an SVP because that is exactly the issue that Stanbridge addressed. Stanbridge addressed the scope and quantum of evidence required to show probable cause to believe that someone is no longer an SVP such that they're entitled to a full discharge hearing. And what Stanbridge said is, saying with approval of the Wisconsin case and with the commitment of Cruz, that the respondent is to provide a plausible expert account. Now, it's not true that he is precluded from presenting an expert report as a probable cause hearing. He can request that the court appoint him an expert and then present that expert's report should he so choose. For example, here, the only report that was presented was the DHS expert, Dr. Smith's report. No other report was before the court. Now, had counsel had a respondent wished, he could have asked the court to appoint him an expert, had that expert evaluate him, and if that expert produced an opinion that he thought was helpful to his case, he could have filed that report with the court and then argued based on that report that he was no longer a sexually violent person. The court would be precluded from making credibility determinations if it has one opinion saying, plausibly, this person is still an SVP, one expert saying, plausibly, he is no longer an SVP. The court must proceed to a full discharge hearing. And we wouldn't be here if that had happened. But in this case, the only report before the court was the DHS expert who opined that he was still an SVP. And Stanbridge says what you need is an expert report. And we know that not only because of Stanbridge's discussion of the Cruz case from Wisconsin, but by the way, that Stanbridge subsequently applied the rule that he had announced because there were two cases consolidated on appeal in Stanbridge, Stanbridge and Lieberman. Both of those cases were discharge probable cause hearing cases. And both of those cases, the respondents, Stanbridge and Lieberman, each had an expert. And the expert filed reports with the court, and the reports contained facts that had the experts concluded were sufficient to show that he was no longer an SVP, would have entitled them to a discharge hearing. But the experts did not so opine, and so the reports did not provide a plausible account. Specifically, in Stanbridge, the expert didn't provide a plausible opinion that Stanbridge was no longer an SVP because he didn't rely on anything new. The whole point of this preliminary probable cause proceeding is it's a threshold to weed out frivolous claims where there's no probable cause to believe the person is no longer an SVP. There's nothing new. And we don't want to relitigate the same issue of is this person still an SVP if there are no new facts. It's basically law of the case. The courts already adjudicated on facts A through O that a respondent is an SVP. If the respondent comes forward and says, based on facts A through O, I'm no longer an SVP, there's no point in relitigating the exact same issue on the exact same facts. You need to show facts P and have someone say, based on P in combination with A through O, that pushed him over the threshold so that he either no longer suffers from a qualifying mental disorder or is no longer substantially probable to re-offend if discharged. Here we simply don't have that. So in Stanbridge, in the Stanbridge half of Stanbridge, the expert simply opined that the respondent was no longer an SVP, but he relied on the same facts as had been considered by the court in a previous adjudication on that issue. And so, again, essentially law of the case. The court was not going to entertain a relitigation of the same facts on the same issue. In the Lieberman half of Stanbridge, the respondent's expert, he discussed the, there was a score, it was the GAF score. There was an instrument that evaluated the strength of a offender's symptoms and his ability to function, his functioning capacity. And the expert noted that the respondent's scores had decreased, showing a dramatic improvement in his ability to function and also a dramatic decrease in the severity of his symptoms. But he did not opine that based on that change in score, the respondent was no longer an SVP. And so the Ohio Supreme Court in Stanbridge held that that was not a plausible account, that Lieberman was no longer an SVP. You needed an expert to actually opine that whatever the changes had been were sufficient. Because otherwise, what you have is essentially lay testimony and argument. And we know that that's not admissible because we know that the only competent evidence of someone's diagnosis or someone's risk of recidivism is expert opinion. And one of the reasons we know that is that. So why doesn't the statute simply require that at this stage in the proceedings that the petitioner must present expert witness or expert testimony or expert opinion? I don't see any language in the statute that requires that. So how would a respondent, how would a petitioner know? Well, that's what Stanbridge has told us. Stanbridge said that the experts had to opine that he was no longer an SVP based on new facts. So the Ohio Supreme Court has told us that is what the statute says. And I will direct the court to paragraphs 76 and 81 of Stanbridge, which is where the court applies the rule that you need an opinion that opines based on new evidence that you're no longer an SVP to each of the cases that were consolidated before it. To get beyond the preliminary. To get beyond the preliminary. And, again, it's just because we don't want to re-litigate the same facts on the same issue. Do you find anything in Dr. Smith's report to be conflicting? Do you find it to be consistent throughout? I think it is consistent for the purposes of probable cause, the probable cause stage. Again, the procedural posture really matters because we know Stanbridge told us the probable cause stage for a discharge proceeding is the same as the probable cause scope of inquiry and quantum of evidence required at the pre-commitment stage. And so that means that the evidence that would be sufficient, the quantum of evidence sufficient at the pre-commitment stage, is the same as the quantum of evidence that would be sufficient at the pre-discharge or at the discharge probable cause stage, which means that if a respondent could be entitled to a discharge hearing, if he could establish probable cause, if he was no longer an SVP, simply by cross-examining or challenging the credibility, essentially, of a contrary expert opinion and presenting argument. If he said, well, this expert relies on these dynamic risk factors to elevate the risk of recidivism above what the static 99R provides as a baseline and those are unreliable for various reasons and he's made this amount of progress and although the expert says that progress is not sufficient, I think it is sufficient, that's a credibility argument. That is not independent content evidence. And if that was sufficient at the discharge probable cause stage, then it would also be sufficient at the pre-commitment stage. In other words, the state would be entitled to a full commitment hearing without presenting any expert testimony or any expert report. Or they could simply say this offender has committed two crimes of sexual violence against minors. We believe that one could infer from that that he is a pedophile and so suffers from a diagnosis of pedophilia, which is a mental disorder. Also, here are a bunch of studies that counsel has found and counsel argues that based on these studies one could infer that he is substantially likely to be a friend and so we're entitled to a full commitment hearing. And if the state tried to do that, respondent's counsel would rightfully object, saying this is not competent evidence of the diagnosis or the likelihood of reoffending. You can't present lay testimony that someone suffers from a particular mental illness. And the court would rightly sustain that objection. The state would need to present competent evidence in the form of an expert opinion. To the extent that respondent has challenged Dr. Smith's interpretation of his treatment progress or of his actuarial scores on the STAT 99-R or of the PPG result from 2013, that is a credibility argument. He is saying you should not credit this opinion because the foundations of it are inadequate. But if he presented his own expert, let's say that they had actually asked the court to appoint Dr. Wood with respect to this discharge proceeding. What were the circumstances under which he got involved in the case? How did that happen and what proceedings did it occur? The circumstances under which Dr. Wood got involved? So in 2014 there was the annual re-exam is my understanding. In 2014 there was the 2014 annual re-exam. Dr. Smith again filed a report in June 2014 saying that respondent was still an SVP. At that time he had a STAT 99-R score of 1 and Dr. Smith noted the 2013 PPG results. So that was not new as of 2015. That was already addressed by the court in 2014. And I believe that respondent asked for the appointment of Dr. Wood. But no report was ever filed. There was no report from Dr. Wood in the record since 2014. Didn't you have something in your pleading in the trial court below that indicated that Dr. Wood had come in and was of the opinion that he was still an SVP? Isn't that in the record? I'm sorry, I'm afraid I don't know. It may have been in one of the earlier proceedings because there were some proceedings surrounding the conditional release issue separate from the annual re-exam for discharge. So in April of 2015 the trial court found that there was no probable cause to believe that respondent was not still an SVP. And then in June 2015 Dr. Smith filed his 2015 re-exam report and that brought us to this proceeding. So all of the evidence, all of the facts that respondent says don't provide an adequate basis for Dr. Smith's report, it's really a credibility challenge. And we know that at the probable cause stage under both Hardin and Standbridge, the trial court is prohibited from entertaining credibility challenges to the expert opinion. All it can do is say is there a basis that if credited would make this a plausible report. Now had respondent asked for an expert to be appointed and gotten that expert to say based on exactly the same facts, if he said based on a STAT 99R score of 1, based on the PPG results from 2013, and based on the treatment progress since the last adjudication, I opine to a reasonable degree of psychological certainty that he is no longer an SVP, then there is no question that respondent would be entitled to a full discharge hearing because now you have one expert saying he is, one expert saying he isn't, both based on changes since the last time they've been adjudicated, and we would have to go to a full hearing. But we simply have one expert opinion. The only evidence is an expert opinion that he is still an SVP. So what the state essentially is saying is that in order for a respondent to get the hearing that he wants, he has to have more than just the ability to call into question the weight of certain factors. Exactly. Does the respondent have an annual right to get an expert appointed? Every year he may be appointed. If he's not indigent, he may retain an expert. And if he is indigent, he may request that the court appoint him an expert. The other thing that's important to remember is that it's not simply an expert opining that he is no longer an SVP. It has to be based on new facts. And so when you look at the three factual bases of Dr. Smith's opinion that respondent takes issue with, none of those are new facts with the exception of his progress in treatment. The static 99-R score of 1, he's had a static 99-R score of 1 at least as far back... I'm sorry. With respect to the static 99 score of 1, that is a new fact. Because respondent has had a static 99 score of 1 going back as far at least as 2010. In 2010, Dr. Smith opined that although respondent was still an SVP, he was suitable for conditional release. He could be managed safely in the community under restrictions. At that time, Dr. Smith noted that respondent had a static 99 score of 1. The static 99, which is not surprising, deals with static factors. It doesn't take into account dynamic risk factors that are other empirical risk factors that change over time. At that time, respondent also had a PPG that showed no deviant sexual arousal, which is the same thing that was shown in the 2013 PPG, no deviant sexual arousal. And yet, on his first stint of conditional release in 2010, respondent suffered significant difficulty with deviant sexual arousal. By his own admission, he says that he had about 60 deviant sexual fantasies a month, more than one a day, and he was masturbating daily to those fantasies. He also started to try and figure out a way to sneak prostitutes into his apartment without the conditional release agent knowing. You're talking about 2010. Yes, in 2010. You're talking about 2010. In 2010. But since then, we've had annual reports since then, and I thought what I read was that there was some diminishment of those types of... There absolutely was. All right. So why are we going back to 2010? Well, the reason we're going back to 2010... To write what's wrong with some 2015's report. Well, the reason we're going back to 2010 is two of the facts that respondent says shows that he's no longer an SVP aren't new. They aren't things that haven't been considered by the court before because the static 99 score of 1 and the PPG results were the same in 2010. So it's basically he's saying here are the same facts, I want to re-litigate the same issue on the same facts that the court found insufficient to establish that he was no longer an SVP in 2014. The other thing that's worth remembering is that the 2013 PPG results, where he showed no deviant sexual arousal, was administered when he was on Eligard. And Eligard is a pharmaceutical agent that suppresses arousal. It diminishes testosterone. So the fact that he did not show arousal to any deviant stimulus when he was taking a drug that suppressed arousal has sort of limited predictive value. In the same way that if he were wearing a blindfold and then they put pictures in front of him and said, are you aroused by these pictures? If he didn't show arousal, it wouldn't mean very much as to whether he would or would not re-offend subsequently. The static 99R also has somewhat limited predictive value, as Dr. Smith explained in his report. For one thing, it excludes a bunch of empirically established dynamic risk factors that are relevant. Can I just ask one other question? Sure. All right. So accepting for the sake of argument that Mr. Rendon should have or could have, was required to have some expert in the room to testify with respect to his progress. But he didn't do that. And at the preliminary hearing, would there have been an opportunity for Mr. Rendon to cross-examine on the report that you're now offering all of this information about and an interpretation to? Well, there are two ways to get to a discharge probable cause hearing. One is by affirmatively filing a petition, which is not what happened here. If you file a petition, then there's testimony. Right. The other is to decline to waive your rights to petition, and that's what happened here. In that case, the statute is very clear. This hearing is limited to written reports and the argument of counsel. So there's no cross-examination if you don't affirmatively file a petition. So here, the evidence he could have presented would have been to request the appointment of an expert, present his own expert report, and then as long as his expert had opined that based on something new, he was no longer an SVP, we would move right along to a discharge hearing. There would be no opportunity for the trial court to say, I don't believe him. Exactly. So my point is that there was no opportunity at this stage in the proceedings for Mr. Rendon to challenge what was in Dr. Smith's report. That was really the only point of view. Right, yes. To bear his burden, he would need to present his own report. That's correct. All right. The other problems with the Statute 99-R is the Statute 99-R, the recidivism rates that are based on of a subsequent sex offense. So it is necessarily a conservative or an underestimate of what recidivism rates actually are because we know that Is that in Dr. Smith's report? Yes, he says it's a conservative estimate. And the reason that we know it's a conservative estimate is actually in this case is an excellent example. We know that the criminal justice system does not detect and successfully charge and prosecute every incident of sex offense. And we know that because Mr. Rendon only has one conviction for a sexually violent offense, and that's the 1987 conviction where he took an 8-year-old off the street and raped her in his van. When he went back into jail after being arrested for luring, was that strictly for, was he held strictly as a parole violation? Yes, Your Honor. I believe he wasn't actually treated for the luring. I believe it was because he had been found, it was like a disorderly conduct, I believe, violation, because he'd been found in bed with his daughter's 17-year-old friend at a party. She'd been drunk. She was unconscious. He subsequently admitted that he had digitally penetrated her while she was unconscious, in addition to having attempted to lure children into his van while on parole. But he then admitted, because one of the important parts of treatment is to go through your offense history and really come to grips with the pattern of offending you've had, he admitted that he has contacted sexual offenses, in other words, sexual assaults, against nine adult women and 16 young girls, and he has not been charged or convicted of any of those. So it is not unreasonable to think that reoffending predictions based only on charges and convictions are going to underestimate the actual reoffending, because this gentleman committed 25 criminal sexual assaults and was only caught and convicted of one. And he said he also committed 20,000, right? And he says that he also has a serious problem with frottage. So there are, you can say that a SAC-99R gave him the lowest possible score of one, but there are also arguments that a SAC-99R underestimates risk and that it doesn't take into account some important risk factors. Specifically, as Dr. Smith went through, Mr. Rendon has nine dynamic risk factors that aggravate his risk or escalate his risk. Now, that is not to say that if a respondent had got an expert, presented a report, if that expert had said, notwithstanding these risk factors, I find that he now has protective factors, and that based on those protective factors, he's made great progress in treatment and so on. He's come to grips with this or that. He's recognized his offense pattern. That would be enough. That would be enough. All he needs to do is present an expert, and he did not request an expert. He could have requested Dr. Wood again. He did not. The only evidence before the court was an expert who opined that the respondent was still on SVP. And Standish says, we can't deal with credibility determinations at this stage. The only other thing I have to point out is the treatment progress that respondent points to. He says he's made great progress in treatment. But as Dr. Smith noted in his report, respondent is still struggling to identify factors that contributed to the difficulties he had during his first stint on conditional release. Doesn't some of that, though, go back to the stuff, the reason why we remanded it, you know, the lie detector stuff? Isn't that what he's referring to? Well, he was talking about since the initial conditional release. So respondent was on conditional release. He was put back into the secure treatment facility and then re-released. And while he was in the secure treatment facility and dealing with some of the issues he had while in his initial stint on conditional release, he was having difficulty identifying what exactly was going on. He was minimizing behaviors. He was inaccurately identifying molestation fantasies as frottage fantasies. And so Dr. Smith said, oh, he's making good progress. I mean, this is how the system is supposed to work. He was put into treatment. He's been working through treatment. And he started out at a high level of treatment need. He had a very serious offense history. He's made great progress. He's gotten through to stage five. He's been put on conditional release. Is there a stage six? There is not. Stage five is transitioning the community. And when one is put on conditional release, you can be put on conditional release not having reached stage five. It's just a question of whether you can be managed in the community. If someone has a very high treatment need, they may need to go all the way to stage five before they get to conditional release. If someone comes in just over the statutory threshold, stage two might get them there. All right. Thank you. Thank you. Give us your best three minutes. Thank you. The state has told you that Mr. Rendon could have requested an expert. And under Section 55, it does say you may request an expert. The court doesn't have to give him one. And we know from the Illinois Supreme Court case of Boatruff, B-O-T-R-U-F-F, that it is essentially you can't get an expert when you don't file a petition for discharge.  It seems like if we remand it, we're setting him up for an impossible standard because you don't have an expert. The only expert who's been disclosed has an opinion that, although it might be challenged, is contrary to what your client would need in order to be able to get out. Well, it's not an impossible standard because, first, the state would have the burden of proof by clearly convincing evidence. But, second, then that puts us in a position of saying, well, now there is a basis to say we should get an expert. Because before this, there's no finding that there's merit for a hearing. And so Boatruff, the case from the Illinois Supreme Court, says, you don't have to give this person an expert because all we're doing is a perfunctory annual reexamination. Factually speaking, just so, because this stuff is a little bit difficult to discern from time to time, is it accurate that in August of 2014, for conditional release while simultaneously asking the court to appoint an expert on his behalf and ask for a probable cause hearing? Is that accurate or inaccurate? I think that's correct, yes. We put all that in the same motion. The state is telling you that they're concerned about re-litigating these issues. They've never been litigated. They have never been litigated. Mr. Rendon knows what he needs to do to stand conditional release. He follows the rules that are set forth. He doesn't know what he needs to do to get to discharge. There's no phase six of treatment. There's no criteria for him to meet. Dr. Smith's report lays out the five phases of treatment in the TDF, but there's no guidelines or criteria for conditional release and what he has to do. And the state has not identified any evidence. If the court were inclined to give Mr. Rendon the process of having this evidentiary hearing, it would involve just examining, cross-examining Dr. Smith, or would it involve a petition for another expert? It would involve a petition for another expert. That's all we need to hear. Thank you. Thank you. Difficult case, difficult issues, but very well researched and written and very capably argued. We appreciate your assistance in helping us come to a just conclusion in this matter. We're adjourned, and we'll get an opinion out to you forthwith. Thank you.